## UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |
|---|---|
| LEMO USA INC., | ) |
|  | ) |
|  | ) |
| **Plaintiff,** | ) |
|  | ) |
| **v.** | )     **Court No. 26-01155** |
|  | ) |
|  | ) |
| U.S. CUSTOMS AND BORDER PROTECTION; RODNEY S. SCOTT, IN HIS OFFICIAL CAPACITY AS COMMISSIONER OF U.S. CUSTOMS AND BORDER PROTECTION; AND THE UNITED STATES OF AMERICA, | ) |
|  | ) |
|  | ) |
|  | ) |
|  | ) |
|  | ) |
| **Defendants.** | ) |
|  | ) |

## <u>COMPLAINT</u>

Plaintiff, LEMO USA Inc.[1] (hereinafter "Plaintiff"), by and through its attorneys, alleges and states as follows:

1.      This action challenges Defendants' broad and sweeping imposition of tariffs on imports from any country, on any schedule, in any amount, and for any policy reason that the President deems an "emergency" under the International Emergency Economic Powers Act ("IEEPA").  Neither the Constitution nor IEEPA grants the President such tariff-levying authority, let alone the limitless authority asserted here.  Beginning in February of 2025, through a series of executive orders, President Trump invoked IEEPA as authority to impose new and substantial tariffs ("IEEPA duties") on goods imported from nearly every foreign country, including countries from which Plaintiff sources its imports.  Plaintiff is responsible for paying these tariffs on its

---

[1] Also, an alternative spelling of LEMO USA Inc. is "LEMO USA INC".

imported goods.

2.       The Supreme Court ruled on February 20, 2026 that IEEPA does not authorize these tariffs.  <u>Learning Resources, Inc. v. Trump</u>, No. 24-1287 (S. Ct. Feb. 20, 2026).   In doing so, the Supreme Court affirmed the decision of this Court and the U.S. Court of Appeals for the Federal Circuit ("Federal Circuit").  <u>See</u> <u>V.O.S. Selections, Inc. v. Trump</u>, 149 F.4th 1312 (Fed. Cir. 2025), <u>aff'd</u>, No. 25-250, 2026 U.S. LEXIS 714   (U.S. Feb. 20, 2026); <u>see also</u> <u>V.O.S. Selections, Inc. v. United States</u>, 772 F. Supp. 3d 1350 (Ct. Int'l Trade 2025).

3.       Through this action, Plaintiff asks the Court to hold for it precisely what the Supreme Court has already held in <u>Learning Resources, Inc. v. Trump</u> in affirming the earlier decision by this Court and the Federal Circuit: that the IEEPA duties imposed by Defendants, and the underlying executive orders that directed them, are unlawful.

4.       This separate action is necessary because, although the IEEPA duties and the underlying executive orders were held unlawful by the Supreme Court, importers that have paid IEEPA duties, including Plaintiff, are not guaranteed a refund for those unlawfully collected tariffs in the absence of their own judgment and judicial relief.

5.       This action is necessary now because Plaintiff paid tariffs that were imposed under IEEPA, and U.S. Customs and Border Protection ("CBP") was expected to begin liquidating entries that are subject to IEEPA tariffs by December 15, 2025.  For unliquidated entries or entries for which liquidation has not yet become final, Plaintiff seeks relief from the impending final liquidations to ensure that its right to a complete refund is not jeopardized.  To that end, Plaintiff intends to file a motion for a preliminary injunction to suspend liquidation during the pendency of this appeal.  For any liquidated entries, Plaintiff seeks an order from the Court directing CBP to reliquidate and issue refunds to Plaintiff of any IEEPA tariffs paid.

6.      Accordingly, Plaintiff seeks (i) a declaration that the IEEPA duties are unlawful and (ii) a full refund from Defendants of all IEEPA duties Plaintiff has already paid to the United States as a result of the executive orders challenged in this lawsuit, including interest, as well as those it will continue to pay.

## JURISDICTION

7.      The Court possesses subject-matter jurisdiction over this action under 28 U.S.C. § 1581(i) and 28 U.S.C. § 2631(i), and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 702, 704, 706.

8.      28 U.S.C. § 1581 provides that "the Court of International Trade shall have exclusive jurisdiction of any civil action commenced against the United States, its agencies, or its officers, that arises out of any law of the United States providing for . . . tariffs, duties, fees, or other taxes on the importation of merchandise for reasons other than the raising of revenue," 28 U.S.C. § 1581(i)(1)(B), and "administration and enforcement with respect to the matters referred to in paragraphs (A) through (C) of this paragraph and subsections (a)–(h) of this section." Id. § 1581(i)(1)(D).

9.      Here, the claims at issue relate to executive orders that made amendments to the Harmonized Tariff Schedule of the United States ("HTSUS").  The HTSUS is a law of the United States setting tariffs.  This Court, therefore, possesses subject-matter jurisdiction over this action under 28 U.S.C. § 1581(i).  See V.O.S. Selections, 149 F.4th at 1329.  Although the Supreme Court has issued its opinion holding that IEEPA does not authorize tariffs, a protest before CBP would be futile at this time, and thus jurisdiction under 19 U.S.C. 1581(a) is unavailable, as the decision is not final until the time period for a request for rehearing has passed.  See  Sup. Ct. R. 44.1 ("Any petition for the rehearing of any judgment or decision of the Court on the merits shall be filed within 25 days after entry of the judgment or decision, unless the Court or a Justice

shortens or extends the time."); see also Sup. Ct. R 45.3 ("In a case on review from any court of the United States, as defined by 28 U. S. C. § 451, a formal mandate does not issue unless specially directed; instead, the Clerk of this Court will send the clerk of the lower court a copy of the opinion or order of this Court and a certified copy of the judgment…The copy of the opinion or order and judgment will be sent 32 days after entry of the judgment, unless the Court or a Justice shortens or extends the time, or unless the parties stipulate that it be issued sooner.").

10.     The APA provides that "{a}gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review." 5 U.S.C. § 704.  Further, the APA provides for broad judicial review of agency actions brought by "person{s} suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of the relevant statute."  5 U.S.C. § 702.

11.     The Court has the same powers at law, in equity, and as conferred by statute as a United States District Court.   28 U.S.C. § 1585.  In a civil action under 28 U.S.C. § 1581, the Court can enter a money judgment against the United States and can order any other appropriate civil relief, including declaratory judgments, injunctions, orders of remand and writs of mandamus or prohibition.  28 U.S.C. §§ 2643(a)(1), (c)(1).

12.     Plaintiff has standing to bring this lawsuit because it is the importer of record for goods imported into the United States from countries subject to the unlawful IEEPA duties as implemented and collected by CBP.  As a result of the executive orders challenged by this lawsuit, Plaintiff has paid IEEPA duties to the United States and thus has suffered injury caused by those orders.  The injury is ongoing as Plaintiff continues to pay IEEPA duties.  Declaratory and injunctive relief from this Court would redress those injuries.  Plaintiff also faces imminent and irreparable harm because entries for which it has paid IEEPA duties were anticipated to liquidate

as early as December 15, 2025.

## PARTIES

13.        Plaintiff is an importer that has made numerous entries of merchandise that were subject to IEEPA duties and has either deposited or paid the additional duties assessed under the IEEPA duties.

14.        Defendant CBP is a component agency of the Department of Homeland Security ("DHS") headquartered in Washington, D.C.  CBP is responsible for border security and collecting tariffs or duties and taxes on goods imported into the United States.

15.        Defendant Rodney S. Scott is the Commissioner of CBP and is sued in his official capacity.

16.        Defendant United States of America received the disputed tariffs and is the statutory defendant under 5 U.S.C. § 702 and 28 U.S.C. § 1581(i)(1)(B).

## GENERAL PLEADINGS

I.    **President Trump Ordered a Series of Tariffs, Invoking IEEPA as the Basis for This Authority**

### A.    The IEEPA Duties

17.        On February 1, 2025, President Trump issued three executive orders imposing tariffs on imports from Canada, Mexico and China.  Each executive order was premised on IEEPA authorizing the tariffs, and for each set of tariffs President Trump claimed that they were justified under IEEPA because of a purported national emergency.

18.        The executive order directed at Mexico, Executive Order 14,194, Imposing Duties To Address the Situation at Our Southern Border, 90 Fed. Reg. 9,117 (Feb. 7, 2025) ("Mexico Tariff Order"), imposed an additional 25% tariff on the import of goods from Mexico. The President's claim of emergency powers was based on "the grave threat to the United States

posed by the influx of illegal aliens and illicit drugs into the United States" and "the failure of Mexico to arrest, seize, detain, or otherwise intercept {drug trafficking organizations}, other drug and human traffickers, criminals at large, and illicit drugs." Id. at 9,118.

19.     The executive order directed at Canada, Executive Order 14,193, Imposing Duties To Address the Flow of Illicit Drugs Across Our Northern Border, 90 Fed. Reg. 9,113 (Feb. 7, 2025) ("Canada Tariff Order"), declared an emergency because of opioid trafficking, and also imposed a 25% tariff, with certain exceptions.

20.     Finally, the executive order directed at China, Executive Order 14195, also declared an emergency because of opioid trafficking, declaring that "the sustained influx of synthetic opioids" was a national emergency and that "{m}any PRC-based chemical companies also go to great lengths to evade law enforcement and hide illicit substances in the flow of legitimate commerce."  Exec. Order No. 14,195, Imposing Duties to Address the Synthetic Opioid Supply Chain in the People's Republic of China, 90 Fed. Reg. 9,121 (Feb. 7, 2025) ("China Tariff Order").  The President's claim of emergency powers was based on "the grave threat to the United States posed by the influx of illegal aliens and drugs into the United States" and "the failure of the {People's Republic of China} government to arrest, seize, detain, or otherwise intercept chemical precursor suppliers, money launderers, other {transnational criminal organizations}, criminals at large, and drugs." Id. at 9,122 (internal citations omitted).

21.     The China Tariff Order imposed an additional 10% ad valorem tariff on products from China imported into the United States on top of existing duties.

22.     On February 5, 2025, the President issued another order, Executive Order 14,200, Amendment to Duties Addressing the Synthetic Opioid Supply Chain in the People's Republic of China, 90 Fed. Reg. 9,277 (Feb. 11, 2025) ("February 5 Amendment").

6

23.     The next month, on March 3, 2025, the President amended the China Tariff Order again through Executive Order 14,228, <u>Further Amendment to Duties Addressing the Synthetic Opioid Supply Chain in the People's Republic of China</u>, 90 Fed. Reg. 11,463 (Mar. 7, 2025).   The March 3 amendment raised the incremental tariffs on imports from China to 20% and justified this increase by claiming that "the PRC has not taken adequate steps to alleviate the illicit drug crisis." <u>Id.</u>

24.     On April 2, 2025, citing trade deficits with our trading partners as its own national emergency, President Trump issued Executive Order 14,257, <u>Regulating Imports With a Reciprocal Tariff To Rectify Trade Practices That Contribute to Large and Persistent Annual United States Goods Trade Deficits</u>, 90 Fed. Reg. 15,041 (Apr. 7, 2025) ("Reciprocal Tariff Order").  The Reciprocal Tariff Order imposed a 10% baseline tariff on nearly all imports to the United States, effective April 5, and additional "reciprocal" tariffs on 57 countries, effective April 9. <u>Id.</u> at 15,049-50 (Annex I).  These higher country-specific tariffs range from 11% to 50%.  <u>Id.</u>

25.     The Reciprocal Tariff Order asserts that "U.S. trading partners' economic policies … suppress domestic wages and consumption, as indicated by large and persistent annual U.S. goods trade deficits." <u>Id.</u> at 15,041.

26.     On April 8, 2025, the President responded to retaliatory tariffs from China by raising the reciprocal tariff rate on products of China by 50 percentage points—from 34% to 84%. Exec. Order No. 14,259, <u>Amendment to Reciprocal Tariffs and Updated Duties As Applied to Low-Value Imports from the People's Republic of China</u>, 90 Fed. Reg. 15,509 (Apr. 14, 2025).

27.     The next day, the President suspended for 90 days the higher country-specific tariffs on products of all countries except for China, for which he raised the "reciprocal" tariff again—from 84% to 125%.  Exec. Order No. 14,266, <u>Modifying Reciprocal Tariff Rates To</u>

Reflect Trading Partner Retaliation and Alignment, 90 Fed. Reg. 15,625 (Apr. 15, 2025). Meanwhile, the 20% trafficking tariff on imports from China remained in place, such that most imports from China faced a minimum 145% IEEPA tariff.

28.     In implementing the executive order-based tariff regime, the President directed CBP to effectuate changes to the HTSUS, requiring that goods subject to the challenged tariffs to be entered under new tariff codes.

29.     On April 14, 2025, several companies filed an action in this Court challenging the legality of these tariff orders.  See V.O.S. Selections, et al. v. Donald J. Trump, et al., No. 25-00066, ECF. No. 2 (Apr. 14, 2025).  As discussed below, this Court and the Federal Circuit held the orders were unlawful, and the Supreme Court affirmed on February 20, 2026.

30.     In the months since the V.O.S. Selections complaint was filed, President Trump, invoking IEEPA, has issued additional executive orders imposing additional tariffs and modifying others.  On July 30, 2025, the President invoked IEEPA to impose additional tariffs on imports from Brazil.  Exec. Order No. 14,323, Addressing Threats to the United States by the Government of Brazil, 90 Fed. Reg. 37,739 (Aug. 5, 2025) ("Brazil IEEPA Order").  Additionally, on August 6, 2025, the President also invoked IEEPA to impose additional tariffs on imports from India because the "Government of India is currently directly or indirectly importing Russian Federation Oil."  Exec. Order No. 14,329, Addressing Threats to the United States by the Government of the Russian Federation, 90 Fed. Reg. 38,701 (Aug. 11, 2025) ("Russian Federation IEEPA Order").  All of the executive orders described above have been, and continue to be, modified by the President.[2]  As explained below, IEEPA does not authorize the President to impose

---

[2] See, e.g., Exec. Order No. 14,197, Progress on the Situation at Our Northern Border, 90 Fed. Reg. 9,183 (Feb. 10, 2025); Exec. Order No. 14,198, Progress on the Situation at Our Southern Border, 90 Fed. Reg. 9,185 (Feb. 10, 2025); Exec. Order No. 14,226, Amendment to Duties To Address the Flow of Illicit Drugs Across Our Northern Border, 90 Fed. Reg. 11,369 (Mar. 6, 2025);

tariffs.  By this complaint Plaintiff challenges those orders the Supreme Court has already held to be unlawful and includes the Brazil IEEPA Order and the Russian Federation IEEPA Order issued under the identical legal grounds ("Contested IEEPA Tariffs").

### B.    CBP's Implementation of the Unlawful Tariffs

31.    CBP is charged with the assessment and collection of duties, including the IEEPA duties.  See 19 U.S.C. §§ 1500, 1502.

32.    In 1988, Congress enacted the Omnibus Trade and Competitiveness Act of 1988, which adopted the new tariff nomenclature: the HTSUS.  Pub. L. No. 100–418, 102 Stat. 1107 (1988).  CBP classifies merchandise imported into the United States consistent with the HTSUS, which sets out the tariff rates and statistical categories using a series of nested chapters,

---

Exec. Order No. 14,227, Amendment to Duties To Address the Situation at Our Southern Border, 90 Fed. Reg. 11,371 (Mar. 6, 2025); Exec. Order No. 14,231, Amendment to Duties To Address the Flow of Illicit Drugs Across Our Northern Border, 90 Fed. Reg. 11,785 (Mar. 11, 2025); Exec. Order No. 14,232, Amendment to Duties To Address the Flow of Illicit Drugs Across Our Southern Border, 90 Fed. Reg. 11,787 (Mar. 11, 2025); Exec. Order No. 14,256, Further Amendment to Duties Addressing the Synthetic Opioid Supply Chain in the People's Republic of China as Applied to Low-Value Imports, 90 Fed. Reg. 14,899 (Apr. 7, 2025); Exec. Order No. 14,298, Modifying Reciprocal Tariff Rates to Reflect Discussions With the People's Republic of China, 90 Fed. Reg. 21,831 (May 21, 2025); Exec. Order No. 14,316, Extending the Modification of the Reciprocal Tariff Rates, 90 Fed. Reg. 30,823 (July 10, 2025); Exec. Order No. 14,325, Amendment to Duties To Address the Flow of Illicit Drugs Across Our Northern Border, 90 Fed. Reg. 37,957 (Aug. 6, 2025); Exec. Order No. 14,326, Further Modifying the Reciprocal Tariff Rates, 90 Fed. Reg. 37,963 (Aug. 6, 2025); Exec. Order No. 14,334, Further Modifying Reciprocal Tariff Rates To Reflect Ongoing Discussions With the People's Republic of China, 90 Fed. Reg. 39,305 (Aug. 14, 2025); Exec. Order No. 14,346, Modifying the Scope of Reciprocal Tariffs and Establishing Procedures for Implementing Trade and Security Agreements, 90 Fed. Reg. 43,737 (Sept. 10, 2025); Exec. Order No. 14,357, Modifying Duties Addressing the Synthetic Opioid Supply Chain in the People's Republic of China, 90 Fed. Reg. 50,725 (Nov. 7, 2025); Exec. Order No. 14,358, Modifying Reciprocal Tariff Rates Consistent With the Economic and Trade Arrangement Between the United States and the People's Republic of China, 90 Fed. Reg. 50,729 (Nov. 7, 2025); Exec. Order No. 14,360, Modifying the Scope of the Reciprocal Tariffs With Respect to Certain Agricultural Products, 90 Fed. Reg. 54,091 (Nov. 25, 2025); Exec. Order No. 14,361, Modifying the Scope of Tariffs on the Government of Brazil, 90 Fed. Reg. 54,467 (Nov. 26, 2025).

headings, and subheadings. 19 U.S.C. § 1202. The primary headings of the HTSUS describe broad categories of merchandise, while its subheadings provide a particularized division of the goods within each category. Id. CBP's regulations govern the classification and appraisement of merchandise, consistent with the HTSUS. See 19 C.F.R. § 152.11 (2025) (stating "{m}erchandise shall be classified in accordance with the Harmonized Tariff Schedule of the United States (19 U.S.C. § 1202) as interpreted by administrative and judicial rulings").

33.     The United States International Trade Commission publishes and maintains the HTSUS consistent with presidential orders. 19 U.S.C. §§ 1202, 3005, 3006; see also Michael Simon Design, Inc. v. United States, 33 C.I.T. 1003, 1010, 637 F. Supp. 2d 1218, 1225 (2009) ("The authority to modify the HTSUS lies with the President"); Maple Leaf Mktg., Inc. v. United States, 528 F. Supp. 3d 1365, 1378–79 (Ct. Int'l Trade 2021).

34.     When goods enter the United States, CBP is responsible for assessing and collecting any tariffs on those goods, after confirming the HTSUS classification of the goods, according to the rates established by the HTSUS. 19 U.S.C. §§ 1202, 1500, 1502. To facilitate this process, CBP communicates to the trade community information regarding changes to the HTSUS and CBP's administration of those changes via its Cargo Systems Messaging Service ("CSMS"). CBP has effectuated the collection of unlawful IEEPA duties, as communicated, through its CSMS guidance,[3] which is a final agency action subject to review under the APA.

---

[3] See, e.g., U.S. Customs & Border Prot., CSMS # 64297449, Guidance: Additional Duties on Imports from Canada (Mar. 3, 2025), available at https://content.govdelivery.com/accounts/USDHSCBP/bulletins/3d519e9; U.S. Customs & Border Prot., CSMS # 64297292, Guidance: Additional Duties on Imports from Mexico (Mar. 3, 2025), available at https://content.govdelivery.com/accounts/USDHSCBP/bulletins/3d5194c; U.S. Customs & Border Prot., CSMS # 64299816, Update – Additional Duties on Imports from China and Hong Kong (Mar. 3, 2025), available at https://content.govdelivery.com/accounts/USDHSCBP/bulletins/3d52328; U.S. Customs & Border Prot., CSMS # 64680374, Guidance – Reciprocal Tariffs, April 5 and April 9, 2025, Effective Dates (Apr. 8, 2025), available at

Each guidance marks the consummation of CBP's decision-making process because it announces the agency's implementation of the Contested IEEPA Tariffs.

### C.    Liquidation

35.    "'Liquidation' means the final computation or ascertainment of duties on entries for consumption or drawback entries."  19 C.F.R. § 159.1.

36.    Typically, when goods enter (i.e., are imported into) the United States, the importer of record pays an estimated duty on the <u>entry</u> based on its customs declaration, which asserts a value, origin and HTSUS classification for the imported goods.  <u>See</u> 19 U.S.C. § 1484. CBP then reviews the customs declaration and may inspect the goods.

37.    CBP then "fix{es} the final appraisement of merchandise" by confirming the final value, classification, duty rate, and final amount of duty for the imported goods.  <u>See</u> 19 U.S.C. § 1500.

38.    Once the final amount of duty is determined by CBP, CBP "liquidates" the entry and notifies the importer of record as to whether it owes more money or is entitled to a refund.  <u>See</u> 19 U.S.C. § 1504.

39.    Liquidation—unless extended—must happen within one year.  <u>See</u> <u>id.</u> § 1504(a).  Typically, liquidation is done automatically by operation of law.  As a matter of practice, CBP normally liquidates entries 314 days after the date of entry of the goods and will usually post a notice on its website.

40.    CBP has discretion to extend the deadline for liquidation for up to one year pursuant to an importer's request and a showing of good cause.  <u>See</u> <u>id.</u> § 1504(b)(2); 19 C.F.R. § 159.12(a)(1)(ii).

---

https://content.govdelivery.com/accounts/USDHSCBP/bulletins/3daf1b6.

41.     This Court possesses the equitable authority to suspend liquidation.  See In re Section 301 Cases, 524 F. Supp. 3d 1355, 1372 (Ct. Int'l Trade 2021).

42.     Once liquidation has occurred, and if the liquidation is protestable, an importer of record has 180 days to file a protest contesting the liquidation, asking CBP to "reliquidate" the entry.  See 19 U.S.C. § 1514.   CBP can also voluntarily reliquidate entries within 90 days of the liquidation.  See id. § 1501. But not all liquidations are protestable; where CBP acts in a ministerial capacity (i.e., without discretion) in imposing a duty, the entry's liquidation cannot be protested. See id.; see also Rimco Inc. v. United States, 98 F.4th 1046, 1053 (Fed. Cir. 2024) (explaining that "{a} protestable decision under §1514(a) requires Customs to have 'engage{d} in some sort of decision-making process'").

43.     While not in the context of a challenge to the legality of tariffs imposed under IEEPA, in other contexts this Court and the Federal Circuit have cautioned that an importer may lack the legal right to recover refunds of duties for entries that have liquidated, even where the tariff is later found to be unlawful.  See In re Section 301 Cases, 524 F. Supp. 3d at 1365-66 (citing Shinyei Corp. of America v. United States, 355 F.3d 1297 (Fed. Cir. 2004)) (examining whether the Federal Circuit's decision in Shinyei that the Court of International Trade has the authority to order the government to reliquidate entries is limited to instances "where a preliminary injunction had been sought and denied"); Target Corp. v. United States, 134 F.4th 1307, 1316 (Fed. Cir. 2025) (examining a claim from the government that the Court of International Trade lacked the authority in that case to order reliquidation or amend the injunction at issue).

## II.     IEEPA Does Not Authorize Tariffs

44.     The Contested IEEPA Tariffs cite IEEPA, 50 U.S.C. § 1701 et seq., the National Emergencies Act, 50 U.S.C. § 1601 et seq., section 604 of the Trade Act of 1974, as amended, 19

U.S.C. § 2483, and 3 U.S.C. § 301 as authority to impose tariffs.

45.     None of these statutes authorizes the President to impose tariffs.  The President and CBP are relying solely on IEEPA as providing the authority to impose and collect the IEEPA duties at issue.  As the Supreme Court has held, IEEPA does not authorize the duties that the Contested IEEPA Tariffs seek to impose.  See Learning Resources, No. 24-1287, slip op. at 20.

46.     IEEPA became law in 1977.  Both the House and Senate committee reports expressed the view that past Presidents had abused the authority to regulate economic transactions in a national emergency under a different statute—the Trading With the Enemy Act ("TWEA")—by using it in circumstances far removed from those that originally gave rise to the declaration of national emergency.  See CHRISTOPHER CASEY ET AL., CONG. RSCH. SERV., R45618, THE INTERNATIONAL EMERGENCY ECONOMIC POWERS ACT: ORIGINS, EVOLUTION, AND USE at 7, n.51 (2024); H.R. Rep. No.  95-459, at 7- 9 (1977); S. Rep. No. 95-466, at 2 (1977).

47.     Accordingly, IEEPA provides the President with authority to take specified actions "to deal with any unusual and extraordinary threat . . . to the national security, foreign policy, or economy of the United States, if the President declares a national emergency with respect to such threat."  50 U.S.C. § 1701(a).

48.     IEEPA grants the President certain powers, but they "may only be exercised to deal with an unusual and extraordinary threat with respect to which a national emergency has been declared for purposes of this chapter and may not be exercised for any other purpose."  Id. § 1701(b).

49.     Those powers include the ability to "investigate, regulate, or prohibit" certain transactions in foreign exchange, payments through banks involving foreign countries or nationals, or imports of "currency or securities."  Id. § 1702(a)(1)(A).

13

50. Under IEEPA, the President may also control, block or prohibit the movement or importation of funds or property in which "any foreign country" or foreign national has an "interest" in, and which is also subject to the U.S. jurisdiction. Id. § 1702(a)(1)(B).

51. Finally, and only when the United States is engaged in "armed hostilities" or has been attacked by a foreign country, the President may "confiscate" property of such a foreign person or country that also is subject to U.S. jurisdiction. Id. § 1702(a)(1)(C).

52. The President, moreover, is limited with respect to when he may use these emergency powers. IEEPA provides that the "{t}he authorities granted to the President . . . may only be exercised to deal with an unusual and extraordinary threat with respect to which a national emergency has been declared . . . and may not be exercised for any other purpose." Id. § 1701(b).

53. The text of IEEPA does not use the word "tariff" or any term of equivalent meaning. IEEPA was first enacted in 1977 and has been amended several times, but it has never been amended to authorize, or been used by any other President to impose, tariffs.

### A. The United States Constitution Vests in Congress—not the President—the Power to Impose Tariffs

54. The United States Constitution provides that "{a}ll legislative Powers herein granted shall be vested in a Congress of the United States." U.S. Const. art. I, § 1. The Constitution also provides that "Congress shall have Power To lay and collect Taxes, Duties, Imposts and Excises…" U.S. Const. art. I, § 8, cl. 1 ("Taxing Clause"), and "{t}o regulate Commerce with foreign Nations." Id., cl. 3 ("Commerce Clause").

55. It has always been understood that tariffs fall within the Taxing and Commerce Clauses.

56. To the extent it is ever permissible under the Constitution for Congress to delegate any part of the powers vested in it by the Constitution to the President, it must do so, at a

minimum, by providing an intelligible principle to direct and cabin the President's authority.  See FCC v. Consumers' Rsch., 145 S. Ct. 2482, 2498 (2025).  In IEEPA, Congress did no such thing.

57.    Reading IEEPA as authorizing tariffs would be self-defeating because it would then also require striking down IEEPA as unconstitutional under the nondelegation doctrine for lack of any intelligible principle.

58.    Moreover, "courts expect Congress to speak clearly if it wishes to assign to an agency decisions of vast economic and political significance." West Virginia v. EPA, 597 U.S. 697, 716 (2022) (citation modified) (quoting Util. Air Regul. Grp. v. EPA, 573 U. S. 302, 324 (2014)).  When Congress has not clearly spoken, courts are directed to find that matters of vast "economic and political significance" are beyond the power of the President.  Biden v. Nebraska, 600 U.S. 477, 505–06 (2023).

59.    By any objective measure, the Contested IEEPA Tariffs are "of vast economic and political significance."  Because IEEPA does not clearly authorize the President to set tariffs—indeed, the statute does not mention the words "tariff" or "duty" and is not even housed in the same title of the U.S. Code as Congress's actual trade laws (Title 19)—the Contested IEEPA Tariffs cannot stand and the Defendants are not authorized to implement and collect them, as the Supreme Court has now held.  See Learning Resources, No. 24-1287, slip op. at 20.

### B.    The Supreme Court, Affirming This Court and the Federal Circuit, Has Ruled the IEEPA Duties Are Unlawful

60.    On May 28, 2025, a three-judge panel of this Court granted summary judgment to the plaintiffs in V.O.S. Selections and permanently enjoined the government from enforcing the IEEPA duties at issue in that case.  See V.O.S. Selections, 772 F. Supp. 3d at 1383.  That decision was appealed to the Federal Circuit.

61.    The Federal Circuit stayed this Court's decision and injunction and ordered an

expedited briefing schedule and hearing.

62.        Sitting en banc, the Federal Circuit issued its decision on August 29, 2025, affirming this Court's decision that the IEEPA duties are unlawful.  See V.O.S. Selections, 149 F.4th at 1340.

63.        In a separate lawsuit filed by a separate group of importers, the U.S. District Court for the District of Columbia held that IEEPA does not authorize tariffs of any sort.  See Learning Res., Inc. v. Trump, 784 F. Supp. 3d 209 (D.D.C. 2025), cert. granted before judgment, No. 24-1287, 2025 LEXIS 308086 (U.S. Sept. 9, 2025).  That decision was appealed to the Court of Appeals for the D.C. Circuit, but before the D.C. Circuit held argument, the United States Supreme Court granted certiorari in both V.O.S. Selections and Learning Resources.  The cases were consolidated, with argument held on November 5, 2025.

64.        On February 20, 2026, the Supreme Court held that the IEEPA duties are unlawful and that jurisdiction is proper in this Court.  Learning Resources, No. 24-1287, slip op. at 5 n. 1, 20.

**III.        Plaintiff Paid Preliminary IEEPA Duties**

65.        As of the date of this complaint, Plaintiff has paid IEEPA duties imposed by the Contested IEEPA Tariffs.

66.        Plaintiff's imports subject to IEEPA entered the United States under new HTSUS codes from foreign countries.

67.        Plaintiff has paid IEEPA duties on a continuous basis.

68.        The entries for which Plaintiff has paid IEEPA duties imposed by the Contested IEEPA Tariffs were scheduled to begin to liquidate on or after roughly December 15, 2025 under the normal 314-day liquidation cycle, or even sooner if CBP were to accelerate liquidations.

69.        Based on Plaintiff's knowledge and belief, CBP has advised importers that it

will not be extending liquidation for entries subject to IEEPA tariffs.

## STATEMENT OF CLAIMS

### COUNT I

### THE CONTESTED IEEPA TARIFFS ARE ULTRA VIRES UNDER COURT PRECEDENT

70.    Paragraphs 1-69 are incorporated by reference.

71.    The Supreme Court, affirming the decision of this Court and the Federal Circuit, held that the President exceeded his authority under IEEPA, 50 U.S.C. § 1701 et seq., when he imposed tariffs on imported goods.  Learning Resources, No. 24-1287, slip op. at 20.

72.    As the Court of International Trade explained in V.O.S. Selections, IEEPA authorizes the President only to "investigate, regulate, or prohibit" certain foreign transactions in times of national emergency.  See V.O.S. Selections, 772 F. Supp. 3d. at 1374.  It does not authorize the imposition of tariffs or duties on imports, and neither the text of IEEPA nor its legislative history contains any clear delegation to the President to set tariff rates.  Id.

73.    The Federal Circuit affirmed that interpretation, holding that Congress did not clearly delegate to the President the authority to impose tariffs under IEEPA and that reading IEEPA to permit such authority would raise grave constitutional concerns, including under the major questions and non-delegation doctrines.  See V.O.S. Selections, 149 F.4th at 1376-77.

74.    The Supreme Court affirmed the lower court decisions holding that "IEEPA does not authorize the President to impose tariffs."  Learning Resources, No. 24-1287, slip op. at 20.

75.    The Contested IEEPA Tariffs are identical in structure, authority claimed, and effect to those struck down by the Supreme Court in Learning Resources, Inc. v. Trump and by the lower courts in V.O.S. Selections.  They purport to impose duties and modify the HTSUS

17

solely under IEEPA.  For the same reasons set forth by the Supreme Court in <u>Learning Resources</u>, No. 24-1287, the Contested IEEPA Tariffs exceed the President's statutory authority and are therefore unlawful, void <u>ab initio</u>, and without effect as applied to Plaintiff.

76.      Plaintiff respectfully requests that this Court apply the binding decision of the Supreme Court, declare the Contested IEEPA Tariffs unlawful as to Plaintiff, enjoin Defendants from enforcing them as to Plaintiff, and order refunds of all IEEPA duties collected from Plaintiff, with interest as provided by law.

### COUNT II

### VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT, 5 U.S.C. § 706 (IN EXCESS OF STATUTORY AUTHORITY)

77.      Paragraphs 1 through 76 are incorporated by reference.

78.      CBP is an agency within the meaning of the APA.  <u>See</u> 5 U.S.C. § 701.  The APA provides that "{a} person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof."  <u>Id.</u>  The APA authorizes judicial review of "final" agency actions.  <u>Id.</u> § 704.  Courts must "hold unlawful and set aside" agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," "contrary to constitutional right, power, privilege, or immunity," or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."  <u>Id.</u> § 706(2).

79.      Defendants' agency actions implementing the Contested IEEPA Tariffs by modifying the HTSUS or otherwise implementing the Contested IEEPA Tariffs and collecting duties, as set forth above, are "final" agency actions because they finally "determine" the "rights or obligations" of parties and are backed by "legal consequences." <u>Bennett v. Spear</u>, 520 U.S. 154, 177-78 (1997).

80.     These actions implementing the Contested IEEPA Tariffs are "in excess of statutory jurisdiction, authority, {and} limitations" because Defendants lack statutory authority to implement, collect, or otherwise demand the payment of tariffs that have not been enacted into law by Congress, have not been duly promulgated pursuant to a lawful delegation from Congress, or have not been authorized by a lawful executive order or proclamation pursuant to a lawful delegation from Congress.

81.     The agency actions modifying the HTSUS explicitly state that they are implementing the Contested IEEPA Tariffs and cite no other authority—because there is no other authority—for these modifications.

82.     Accordingly, these actions fall within Defendants' statutory jurisdiction and authority only to the extent that the Contested IEEPA Tariffs are themselves lawful.  But as discussed above and alleged in Count I, the Contested IEEPA Tariffs are ultra vires and unlawful because they exceed the President's authority under IEEPA.  And, as alleged in Count III, to the extent IEEPA does authorize these tariffs, IEEPA is an unlawful delegation of legislative authority. The agency actions modifying the HTSUS or otherwise implementing the Contested IEEPA Tariffs are, thus, themselves unlawful.

83.     Defendants' agency actions are also "contrary to constitutional right, power, privilege or immunity," 5 U.S.C. § 706(2)(B), because, as set forth in Count III and incorporated by reference herein, their only purported source of authorization, IEEPA, violates Article I, § 1 of the U.S. Constitution.

84.     For these reasons, consistent with Supreme Court precedent, this Court should declare that Defendants' agency actions are "in excess of statutory jurisdiction, authority, or limitations," 5 U.S.C. § 706(2)(C), and "contrary to constitutional right, power, privilege, or

immunity," id. § 706(2)(B), set modifications to the HTSUS aside, and enjoin Defendants and their agents, employees, and all persons acting under their direction or control from taking any action to collect the Contested IEEPA Tariffs.

85.    If Defendants' agency actions are not declared unlawful, set aside and enjoined, Plaintiff will suffer substantial injury, including irreparable injury.

## COUNT III

## ALTERNATIVE– THE CONTESTED IEEPA TARIFFS ARE UNCONSTITUTIONAL

86.    Paragraphs 1-85 are incorporated by reference.

87.    In the alternative, if the Court were to construe IEEPA as authorizing tariffs, the Contested IEEPA Tariffs must be held unlawful because IEEPA would constitute an impermissible delegation of legislative power from Congress to the President.

88.    Article I, § 1 and § 8 of the U.S. Constitution vests in Congress exclusively the power to "lay and collect … Duties."   U.S. Const. art. I, § 8, cl. 1.

89.    Under separation of powers principles and binding precedent of the U.S. Supreme Court, Congress cannot delegate its power to the President unless, at the very least, it provides an intelligible principle that directs and meaningfully constrains the President's exercise of that power.  IEEPA does not do that.

90.    Plaintiff therefore seeks a declaration that the Contested IEEPA Tariffs are unconstitutional as to Plaintiff and asks that the Court enjoin Defendants from enforcing them as to Plaintiff and order refund of all IEEPA duties collected from Plaintiff, with interest as provided by law.

## COUNT IV

## (DECLARATORY RELIEF, 28 U.S.C. § 2201)

91.     Paragraphs 1-90 are incorporated by reference.

92.     Federal courts have the power to declare "the rights and other legal relations of any interested party seeking such a declaration."  28 U.S.C. § 2201(a).

93.     Plaintiff's claims present an actual controversy as to the President's authority under IEEPA, the constitutionality of IEEPA, and the authority of CBP to implement and collect the resulting tariffs.

94.     Plaintiff is the importer of record and has suffered injury by being required to pay IEEPA duties as a result of the imposition of the Contested IEEPA Tariffs on goods it has imported into the United States.

95.     This Court can exercise its equitable power to enter a declaratory judgment that the Contested IEEPA Tariffs are unlawful for any of the above reasons, and that CBP lacks authority to implement and collect the resulting tariffs, as to Plaintiff.

PRAYER FOR RELIEF

Wherefore, Plaintiff respectfully requests that this Court:

1)  declare that the President lacks authority under IEEPA to impose tariffs;

2)  declare that the Contested IEEPA Tariffs are ultra vires and void ab initio with respect to Plaintiff;

3)  declare that, with respect to Plaintiff, CBP lacks authority to implement and collect any tariffs set out in the HTSUS that are based on the Contested IEEPA Tariffs;

4)  with respect to Plaintiff, enjoin Defendants from imposing and enforcing any tariffs set out in the HTSUS that are based on the Contested IEEPA Tariffs;

5) order the United States to refund to Plaintiff all IEEPA duties collected on its entries, whether liquidated or unliquidated, including those that it continues to collect during the pendency of this appeal, with interest as provided by law; and

6) award Plaintiff its reasonable costs, including attorneys' fees, incurred in bringing this action; and

7) grant such other and further relief as this Court deems just and proper.

Respectfully submitted,

Dated: February 23, 2026

/s/ Jeffrey S. Grimson
Jeffrey S. Grimson
Kristin H. Mowry
Jill A. Cramer
Sarah M. Wyss
Meredith A. DeMent
Bryan P. Cenko
Yixin (Cleo) Li
Savannah R. Maxwell
Mowry & Grimson, PLLC
5335 Wisconsin Ave, NW
Suite 810
Washington, DC 20015
202-688-3610
jsg@mowrygrimson.com
*Counsel to Plaintiff*